1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

REBECCA CLEVELAND,

        Plaintiff,

  vs.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

_____/

No. C 10-5348 MEJ

**ORDER DENIES PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**ORDER GRANTS DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Rebecca Cleveland ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of Social Security, Defendant Michael J. Astrue ("Defendant"), denying Plaintiff's claim for disability insurance benefits. Pending before the Court are the parties' cross-motions for summary judgment. (Dkt. ## 10, 12.) Having read and considered the parties' papers, the administrative record below, and the relevant legal authority, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment for the reasons set forth below.

## II. BACKGROUND

**A.**     **Education and Work Experience**

Plaintiff was born on April 27, 1961. (Administrative Record ("AR") 91.) At the time of her

United States District Court
For the Northern District of California

1  application, she was married and living with her husband in Fremont, California.  (AR 91-92.)  She

2  attended some college and received a dental assistant certificate in 1985.  (AR 170.)  In the past,

3  Plaintiff worked as a manager, stock clerk, and cashier in the natural foods section of Raley's.  (AR

4  169, 170, 174.)

5  **B.      Medical History**

6         Plaintiff's disability application appears to stem from a variety of  medical conditions.

7  Following is a summary of her medical history as provided in the administrative record.

8         Plaintiff's records from Kaiser Permanente date back to May 22, 2002.  (AR 174-265.)

9  Records include various reports regarding dermatology, discussions on diet and a gastric bypass

10  procedure, as well as treatment of cysts.  In health questionnaires that Plaintiff completed on August

11  9, 2002 and March 21, 2005, Plaintiff indicated that she was or had been depressed, but that she did

12  not feel sad, down, or hopeless.  (AR 242-43, 257-58.)  The Kaiser records indicate that she used

13  Prozac as early as 2002.  (AR 247, 251, 260.)

14         On October 2, 2002, Plaintiff completed a Nutrition Evaluation for Obesity Surgery.  (AR

15  262-65.)  She indicated that she injured her knee approximately one-and-a-half years prior, but

16  occasionally worked out on the elliptical machine for 25 to 30 minutes at a time.  (AR 262.)  The

17  evaluator recommended that Plaintiff start exercising 20 minutes a day, 5 times a week and avoid

18  calorically-dense food.  (AR 264.)

19         On October 10, 2002, Dolly Ahluwalia, M.D. referred Plaintiff for a pre-gastric bypass

20  psychological evaluation.  (AR 178-79.)  Amy J. Kearney, Psy.D., performed the evaluation on

21  October 21, 2002.  (AR 174-76.)  Dr. Kearney found no signs of depression, noting that this may be

22  the result of Plaintiff's use of Prozac.  (AR 175.)  She concluded that Plaintiff did not suffer from

23  significant psychological difficulties that would impair her decision-making abilities, and did not

24  exhibit psychosis or cognitive impairment.  (AR 176.)  Dr. Kearney recommended that Plaintiff talk

25  with Dr. Choi regarding the specific risks of the gastric bypass surgery, that she keep in close

26  contact with her physician after the surgery and attend a gastric bypass support group, and that the

27  start a regular exercise regimen in order to help her maintain her weight and increase self-esteem.

28

1   (AR 176.)

2       On November 20, 2002, Plaintiff underwent an at-home sleep study with continuous pulse

3   oximetry.  (AR 212.)  Lillian Choi, M.D., interpreted the results as showing a pattern suggestive of a

4   sleep disorder, compatible with moderate sleep apnea.  (AR 212.)  Dr. Choi strongly recommended a

5   10 to 15% reduction in body weight.  (AR 212.)

6       On January 18, 2007, Plaintiff began treatment with Khalid A. Baig, M.D.  (AR 362.)  At Dr.

7   Baig's request, Yvonne Sun, M.D., performed a complete lumbar spine exam on March 15, 2007.

8   (AR 358.)  Dr. Sun found left L5-S1 facet arthrosis, no fracture or subluxation, discal heights

9   maintained aside from L5-S1 narrowing, mild anterior endplate lipping at L3-4 through L5-S1 level,

10  and anterior endplate lipping and slight narrowing at L1-2 level.  (AR 358.)  Dr. Sun provided the

11  following impression: L1-2 and L5-S1 disc disease.  (AR 358.)

12      An August 17, 2007 echocardiogram report revealed mostly normal findings except mild

13  mitral valve regurgitation, trace tricuspid valve regurgitation, and mild asymmetrical septal

14  hypertrophy (AR 355).

15      On September 6, 2007, Calvin Pon, M.D., completed an orthopedic evaluation at the request

16  of the Social Security Administration, Department of Social Services.  (AR 266-68.)  Plaintiff's chief

17  complaints were bilateral wrist pain, hand pain, and numbness that she had for approximately six-

18  and-a-half years, diffused back pain that she had since the previous year, and bilateral knee pain for

19  six-and-a-half years.  (AR 266.)  Plaintiff told Dr. Pon that she could walk up and down stairs, she

20  could stand and walk for 45 minutes, and that she did not need an ambulatory aid.  (AR 266).

21  Plaintiff told Dr. Pon that while she did not cook and needed some assistance going shopping, she

22  did the dishes, laundry, and vacuuming, and she was able to drive.  (AR 266.)

23      Dr. Pon had the diagnostic impression that Plaintiff may have possible tendonitis in her

24  hands, possible spinal disc disease, and possible degenerative changes in the knee and spinal facet

25  joints.  (AR 268.)  However, during Plaintiff's physical examination, Dr. Pon noted Plaintiff

26  ambulated with no aid, had a stable, though slightly slow gait, and had no limp.  (AR 267.)  Dr. Pon

27  observed that Plaintiff was able to rise normally and could squat half the way down and come to an

28

**United States District Court**
For the Northern District of California

1  upright position normally.  (AR 267.)  Plaintiff could also get on and off of the examination table

2  normally.  (AR 267.)  Inspection of the neck, trunk, thoracolumbar spine, and wrists were normal.

3  (AR 267.)  Examination of Plaintiff's upper extremities was "normal," but Dr. Pon noted that sensory

4  examination results where '[d]ecreased [in] both hands."  (AR 267.)  Dr. Pon concluded that, "In

5  spite of [Plaintiff's] complaint of bilateral wrist pain and bilateral hand pain and numbness, there is

6  no functional impairment of her right or left hand and she should be able to perform gross and fine

7  manipulate tasks with both hands on a frequent basis."  (AR 268.)  He also opined that Plaintiff

8  should be able to lift up to 20 pounds occasionally and 10 pounds frequently.  (AR 268.)

9        For Plaintiff's lower extremities, Dr. Pon found Plaintiff's knees had a full range of motion in

10  flexion and extension, and that motor muscle testing for her bilateral knee extensors and flexors

11  were normal.  (AR 267-68.)  Dr. Pon noted that upon palpation of both knees, Plaintiff complained

12  of tenderness along the medial joint line, but he found no laxity or crepitations.  (AR 268.)  Dr. Pon

13  concluded that Plaintiff "should be able to stand and walk for a total of 6 hours during an 8-hour

14  workday" and "should be able to sit for [the same amount of time]."  (AR 268.)  Dr. Pon found

15  stooping should be limited to occasionally, as well as crouching, kneeling, and squatting, and that

16  Plaintiff could climb stairs on a frequent basis.  (AR 268.)

17        On September 12, 2007, Jasdeep S. Aulakh, M.D., performed a complete psychiatric

18  evaluation.  (AR 269-73.)  Plaintiff told Dr. Aulakh that she felt depressed for not being able to

19  work or take care of herself and that she got very little sleep.  (AR 269-70.)  Dr. Aulakh noted

20  Plaintiff had not had any inpatient psychiatric care.  (AR 270.)  Plaintiff reported that she did some

21  light household chores, errands, shopping and cooking, and was able to go places alone.  (AR 271.)

22  Dr. Aulakh found Plaintiff related in a pleasant manner, was cooperative with good eye contact and

23  a linear thought process, and had no paranoia or suicidal or homicidal ideation.  (AR 270-71.)  Dr.

24  Aulakh noted that Plaintiff "endorsed feeling well though has a history of some depressive

25  cognitions," and described her prognosis as good.  (AR 272.)  Dr. Aulakh concluded that Plaintiff's

26  "mental status examination today revealed no evidence [of] perpetual disturbances or delusional

27  disorders at this time."  (AR 272.)

28

1    On September 21, 2007, S. Mathur, M.D., completed a Physical Residual Functional

2   Capacity Assessment.  (AR 279-83.)  For exertional limitations, Dr. Mathur determined that Plaintiff

3   could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or

4   walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and

5   had unlimited push and/or pull abilities.  (AR 280.)  Dr. Mathur found no postural, manipulative,

6   visual, communicative, or environmental limitations.  (AR 280-82.)  Dr. Mathur also completed a

7   case analysis.  (AR 284-87.)  Dr. Mathur noted that while Plaintiff's medical record included "little

8   treatment" for non-debilitating conditions such as cysts, there was little evidence supporting

9   Plaintiff's claims of debilitating physical impairments.  (AR 285-86.)

10    On October 12, 2007, Ida Hilliard, M.D., also completed a psychiatric review, finding that

11   Plaintiff did not have a severe mental disorder and was only mildly limited with regard to daily

12   living, social functioning, and concentration, persistence or pace.  (AR 274-78.)  Dr. Hilliard

13   diagnosed Plaintiff as having depressive disorder.  (AR 276.)  Nasra S. Haroun, M.D., later

14   independently reviewed the record in February 2008, and affirmed Dr. Hilliard's finding that

15   Plaintiff's mental impairments were not severe.  (AR 288-90.)

16    Dr. Baig referred Plaintiff to the California Center for Sleep Disorders, where she underwent

17   a sleep study on December 3, 2007.  (AR 347-53.)  Plaintiff was diagnosed with "mild obstructive

18   sleep apnea" and it was noted that CPAP therapy resulted in "near elimination of respiratory events"

19   during sleep.  (AR 348.)

20    On April 22, 2008, Rory Satterfield, M.D., evaluated the results of an MRI of Plaintiff's right

21   knee.  (AR 343-44, 377-78.)  Dr. Satterfield provided the following impression:

22    1.    Osteoarthritis, primarily in the medial compartment.
      2.    Medial meniscus degeneration, partial extrusion of the body and a
23          large horizontal tear through the posterior horn.
      3.    Proximal medial collateral ligament interstitial tear and degenerative
24          changes.
      4.    Degenerative signal changes within the posterior cruciate ligament.
25    5.    Small joint effusion.  There is focal synovial nodularity in the
            posterior aspect of the lateral parapatellar recess.
26    6.    Very small posteromedial popliteal cyst.

27   (AR 344, 378.)

28
                                   Page 5 of  35

United States District Court
For the Northern District of California

1    On April 30, 2008, Shahna G. Rogosin, M.D. completed a psychiatric diagnostic interview.

2    (AR 317-19.)  Dr. Rogosin diagnosed major depressive disorder, generalized anxiety disorder, post-

3    traumatic stress disorder ("PTSD"), hypothyroidism, sleep apnea, degenerative disk disease, torn

4    ligament in her right knee, and migraines.  (AR 318.)  Dr. Rogosin estimated Plaintiff's Global

5    Assessment of Functioning ("GAF") at 50.  (AR 318.)  A GAF score of 41–50 indicates "[s]erious

6    symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious

7    impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

8    American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 1994)

9    ("DSM–IV"), 32.  Dr. Rogosin prescribed an increased dosage (40 mg) of Prozac and recommended

10   that Plaintiff contact a therapist for supportive therapy on a weekly basis.  (AR 318-19.)  Dr.

11   Rogosin recommended she return for a followup appointment in four to six weeks time.  (AR 319.)

12       On May 2, 2008, John W. Jaureguito, M.D., saw Plaintiff for an orthopedic consultation

13   regarding a right knee condition.  (AR 340-42, 399-400.)  Dr. Jaureguito noted that her MRI was

14   consistent with a meniscus tear and early medial compartment arthritis.  (AR 340, 342, 400.)  He

15   recommended proceeding with arthroscopy.  (AR 340, 342, 400.)

16       On May 20, 2008, Dr. Jaureguito performed right knee arthroscopy surgery and patellar

17   chondroplasty.  (AR 382-84.)

18       Plaintiff returned to Dr. Rogosin on June 4, 2008 for a followup evaluation.  (AR 315-16.)

19   Dr. Rogosin noted the same DSM-IV diagnosis as on previous visits, and recommended that

20   Plaintiff pursue weekly therapy sessions.  (AR 315-16.)  Dr. Rogosin continued the 40mg Prozac

21   dosage and added Wellbutrin XL 150mg.  (AR 316.)  She again recommended that Plaintiff contact

22   a therapist for supportive therapy.  (AR 316.)

23       On June 30, 2008, Plaintiff returned to Dr. Rogosin for a followup evaluation.  (AR 314-15.)

24   Dr. Rogosin noted that Plaintiff had to discontinue Wellbutrin XL after just a week because she was

25   hospitalized for three days after her primary care physician started a medication for appetite control,

26   which resulted in urticaria.  (AR 314.)  Dr. Rogosin noted the same DSM-IV diagnosis as on

27   previous visits, and recommended that Plaintiff continue weekly therapy sessions.  (AR 314.)  Dr.

28

1    Rogosin continued the 40mg Prozac dosage and discontinued Wellbutrin XL.. (AR 314.)

2         On July 11, 2008, Rory Satterfield, M.D., interpreted an imaging scan performed at Inview

3    Medical Imaging. (AR 337-38, 375-76.) Dr. Satterfield indicated the following impression: "(1)

4    Oblique tear of the body of the medial meniscus involving undersurface peripherally; (2) Mild

5    medial femoral and lateral tibial plateau cartilage erosion and signal abnormality. There are very

6    small marginal articular spur [ ] due to arthritis; [and] (3) Mild chronic interstitial tears and

7    degeneration of the medial and fibular collateral ligaments proximally." (AR 338, 376.)

8         Plaintiff saw Dr. Rogosin again on July 21, 2008. (AR 313.) Dr. Rogosin noted the same

9    DSM-IV diagnosis as on previous visits, and recommended that Plaintiff continue weekly therapy

10   sessions. (AR 313.) She again referred Plaintiff to her primary care physician for testing to ensure

11   that her thyroid function was within normal limits. (AR 313.) Dr. Rogosin continued the 60mg

12   Prozac dosage. (AR 313.)

13        Dr. Baig saw Plaintiff again on August 20, 2008, at which time they discussed the results of

14   an MRI on her left knee, and Plaintiff reported that she "feels fine." (AR 336.)

15        On August 25, 2008, Plaintiff returned to Dr. Rogosin for a followup evaluation. (AR 312-

16   13.) Dr. Rogosin noted the same DSM-IV diagnosis as on previous visits, and recommended that

17   Plaintiff continue weekly therapy sessions. (AR 312.) Dr. Rogosin continued the 60mg Prozac

18   dosage and restarted Wllbutrin XL, 150mg. (AR 312.)

19        Plaintiff also saw Dr. Jaureguito for a followup visit on August 25, 2008. (AR 396-97.) Dr.

20   Jaureguito noted that Plaintiff's right knee had improved dramatically, but her left knee pain

21   worsened with activity, particularly with kneeling or squatting. (AR 396.) Dr. Jaureguito diagnosed

22   a left knee medial miniscus tear and right knee pain, status post partial medial meniscectomy. (AR

23   396.) In regards to her left knee, Dr. Jaureguito recommended that Plaintiff proceed with

24   arthroscopy with partial meniscectomy and chondroplasty. (AR 396.) Dr. Jaureguito also

25   recommended a cortisone injection for the right knee while Plaintiff was under anesthetic for the left

26   knee procedure. (AR 397.)

27        On September 4, 2008, Plaintiff underwent left knee arthroscopy surgery, patella

28                                      Page 7 of 35

United States District Court
For the Northern District of California

chondroplasty, and a right knee cortisone injection, performed by Dr. Jaureguito.  (AR 379-81.)

On September 11, 2008, Dr. Jaureguito examined Plaintiff one week post surgery.  (AR 395.) He noted that the right knee was feeling much better after the cortisone injection, and that the left knee was healing nicely.  (AR 395.)  Dr. Jaureguito diagnosed right knee pain status post partial medial meniscectomy and left knee status post partial medial and lateral meniscectomy and chondroplasty.  (AR 395.)  He recommended that Plaintiff slowly increase her activity level and perform an independent exercise program.  (AR 395.)

Plaintiff returned to Dr. Jaureguito for a followup visit on November 24, 2008.  (AR 394.) Dr. Jaureguito noted that Plaintiff reported a fair amount of swelling and discomfort in her left knee, which was in turn aggravating her right knee.  (AR 394.)  The physical examination revealed moderate effusion and normal stability in the left knee, and a slightly antalgic gait in the right knee. (AR 394.)  He diagnosed right knee pain, status post partial medial meniscectomy, and left knee status post partial medial and lateral meniscectomy and chondroplasty.  (AR 394.)  Dr. Jaureguito performed an aspiration and cortisone injection, and he recommended continued exercise and increased activity level.  (AR 394.)

Dr. Jaureguito examined Plaintiff's left knee on January 8, 2009.  (AR 393.)  He noted that Plaintiff was doing much better, that her knee was far less inflamed, and she was returning to normal activity level.  (AR 393.)  He diagnosed "Left knee pain, status post partial medial and lateral meniscectomy and chondroplasty," and recommended a gentle exercise program and increased activity level as tolerated.  (AR 393.)  He further recommended that she return to his office on an as-needed basis.  (AR 393.)

On January 28, 2009, Dr. Jaureguito saw Plaintiff for a followup visit.  (AR 391.)  He noted that Plaintiff complained of continued problems with her left knee, but also noted that the right knee continued to do relatively well.  (AR 391.)  Upon examination of the left knee, Dr. Jaureguito noted a range of motion of 0-125 degrees, moderate effusion, diffuse joint line tenderness, normal stability, and slightly antalgic gait.  (AR 391.)  He diagnosed left knee arthritis, noting that Plaintiff was developing "a relatively rapid onset postmeniscectomy arthritis."  (AR 391.)  He recommended a

1    cortisone injection and aspiration before considering further options, and also recommended gentle

2    exercise, ice and elevation.  (AR 391.)

3          On March 9, 2009, Plaintiff visited Dr. Jaureguito for a hyaluronic acid injection in her left

4    knee.  (AR 390.)  Dr. Jaureguito administered the injection, and he also had a discussion with

5    Plaintiff regarding the surgical option of Artho-Surface, which he recommended as an option should

6    the injections be unsuccessful.  (AR 390.)

7          On March 18, 2009, Plaintiff returned to Dr. Jaureguito for a second hyaluronic acid

8    injection.  (AR 389.)  He noted that her symptoms were unchanged, diagnosed left knee arthritis, and

9    administered the second injection, recommending that she return in 7-14 days for a final injection.

10   (AR 389.)

11         Plaintiff returned to Dr. Jaureguito on March 27, 2009 for an examination of her left knee

12   and third injection.  (AR 388.)  Dr. Jaureguito noted that Plaintiff had not noticed any improvement

13   in the knee symptoms.  (AR 388.)  He noted a range of motion of 0-130 degrees, no effusion, and

14   diffuse joint line tenderness.  (AR 388.)  Dr. Jaureguito diagnosed left knee arthritis, gave her a final

15   hyaluronic acid injection, and recommended gentle exercise.  (AR 388.)

16         On April 24, 2009, Plaintiff returned to Dr. Jaureguito for a re-evaluation.  (AR 387.)  He

17   noted that the hyaluronic acid injections did not provide any significant relief, and he diagnosed left

18   knee arthritis with a slightly antalgic gait.  (AR 387).  Dr. Jauregito recommended that Plaintiff

19   continue with activity modification, gentle exercise, and the use of oral anti-inflammatory

20   medications on an as-needed basis, as she weighed her surgical options.  (AR 387.)

21         On July 7, 2009, Dr. Satterfield noted that an MRI taken at that time revealed the following

22   impression:

23          1.   Cholelithiasis.
            2.   Normal urinary tract.
24          3.   Right adrenal gland 1.4 cm low density mass consistent with a benign
                 adenoma.
25          4.    Very small sigmoid colon diverticula.
            5.   Severe thoracolumbar degenerative disk disease and arthropathy with
26               severe left L5-S1 neural foraminal stenosis. Scoliosis.

27   (AR 329).

28                                    Page 9 of  35

On July 16, 2009, Khalid Baig, M.D., completed a one-page checkbox form entitled "Medical statement regarding low back pain for Social Security disability claim." (AR 325.) Dr. Baig's chart notations provide a restrictive functional level for Plaintiff, noting that Plaintiff suffers from moderate to severe pain. (AR 325.) Dr. Baig recommended the following limitations: standing no more than 15 minutes at a time, sitting no more than 2 hours at a time, working no more than 1 hour per day, and no lifting, bending, or stooping. (AR 325.) Dr. Baig also noted chronic lower back pain. (AR 325.) Dr. Baig also completed a one-page checkbox form entitled "Medical statement regarding knee problem for Social Security disability claim." (AR 326.) Dr. Baig noted that Plaintiff suffered from moderate pain, and he recommended the following limitations: standing no more than 15 minutes at a time and sitting no more than 2 hours at a time, no lifting, bending, stooping, or climbing ladders, and only occasional balancing and climbing stairs. (AR 326.)

On August 31, 2009, Dr. Baig prepared a letter stating that Plaintiff's sciatica and right knee pain made it very difficult for her to be normally active. (AR 401.) Dr. Baig stated that Plaintiff remained disabled due to her conditions, and she was therefore unable to "perform regularly so as to be employed." (AR 401.)

On September 15, 2009, Plaintiff's spine was examined, and the following impression was noted: (1) Moderate scoliosis of the lumbar spine. Alignment otherwise anatomic; (2) L2-3 and L4-5 disc disease with vacuum changes; and (3) no compression fractures demonstrated. (AR 404.) The examiner found that Plaintiff's lumbar spine was in anatomic alignment. (AR 404.) Based on an MRI performed that same day, the following impression was reported:

    1.    There is increased marrow edema surrounding the L2-3 disc space without edema of the disc. This is probably related to Medic type I degenerative change. Short term followup MRI is recommended to document decrease in the marrow edema.

    2.    There is a mild broad based disc bulge at T12-L1, but there is little effect on the thecal sac or conus medallaris.

    3.    There is moderate to severe right neural foraminal narrowing at L2-3 which is partly related to the patient's scoliosis. There is also mild to moderate left neural foraminal narrowing at L3-4 and L2-3.

(AR 402-03.)

///

**C.      Procedural Background**

On May 16, 2007, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability beginning June 1, 2001.  (AR 11, 91-93.)  The application was denied initially on October 12, 2007, (AR 52), and upon reconsideration on February 6, 2008 (AR 53).  Plaintiff thereafter filed a written request for a hearing on March 11, 2008.  (AR 70-71.)

On August 6, 2209, Administrative Law Judge ("ALJ") Randolph E. Schum heard the case.  (AR 33-51.)  Plaintiff appeared at the hearing represented by her attorney, Pamela Vincent.  (AR 11, 33.)  Diana L. Wong testified as an impartial vocational expert.  (AR 11, 45-49.)  On October 14, 2009, ALJ Schum concluded that Plaintiff was not disabled under the Social Security Act.  (AR 11-20.)  ALJ Schum's decision became the final decision of the Commissioner when the Appeals Council declined to review it on September 24, 2010.  (AR 1-3.)

**D.      The ALJ's Findings**

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience.  20 C.F.R. § 404.1520(b).  Here, ALJ Schum determined that Plaintiff had not performed substantial gainful activity since June 1, 2001.  (AR 13.)

At step two, the ALJ must determine, based on medical findings, whether claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act.[1]  If no

---

[1]At step two, "severe" means any impairment or combination of impairments that significantly limits the claimant's physical or mental ability to perform work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  This is a de minimis inquiry designed to weed out nonmeritorious claims at an early stage.  *Bowen v. Yuckert*, 482 U.S. 137, 148, 153-4 (1987).  "Only those claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits" at step two of the analysis.  *Id*. at 158 (citations omitted).

1   severe impairment is found, the claimant is not disabled.  20 C.F.R. § 404.1520(c).  Here, ALJ

2   Schum determined that Plaintiff had the following severe impairements: "meniscal tears,

3   degeneration and arthritis of the knees, degenerative changes of the lumbar spine, and obesity."  (AR

4   13.)

5          If the ALJ determines that the claimant has a severe impairment, the process proceeds to the

6   third step, where the ALJ must determine whether the claimant has an impairment or combination of

7   impairments which meets or equals an impairment in the Listing of Impairments.  20 C.F.R. §

8   404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If a claimant's impairment either meets the listed

9   criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively

10  presumed to be disabled.  *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).  Here, ALJ Schum

11  determined that Plaintiff did not have any impairment or combination of impairments meeting or

12  equaling in severity any impairment set forth in the Listing of Impairments.  (AR 16.)

13         The fourth step of the evaluation process requires that the ALJ determine whether the

14  claimant's Residual Functional Capacity ("RFC") is sufficient for him to perform past relevant work.

15  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work setting, despite

16  limitations caused by medically determinable impairments.  20 C.F.R. § 416.945(a).  In assessing an

17  individual's RFC, the ALJ must consider "his or her symptoms (such as pain), signs, and laboratory

18  findings together with other evidence we obtain."  20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c).

19  Here, ALJ Schum determined that Plaintiff has the RFC to perform sedentary work as defined in 20

20  C.F.R. § 404.1567(a), with additional restrictions noted in his decision.  (AR 16.)  Specifically, ALJ

21  Schum established the following RFC:

22         [Plaintiff's] RFC is at a sedentary level of physical exertion with the
           ability to stand/walk for 2 hours during an 8-hour day and the ability
23         to sit for 6 hours during the same length of time.  She is able to
           occasionally climb stairs and ramps, but unable to climb ropes,
24         scaffolds, and ladders.  On an occasional basis, [Plaintiff] is able to
           stoop, crawl, crouch, and kneel.  She is unable to repetitively use foot
25         controls and she needs to avoid concentrated exposure to vibration and
           to unprotected heights.

26

27  (AR 16.)  Based on this RFC, the ALJ determined that Plaintiff was unable to perform any of her

28

United States District Court
For the Northern District of California

1  past relevant work.  (AR 18-19.)

2        In the fifth step of the analysis, the burden shifts to the ALJ to prove that there are other jobs

3  existing in significant numbers in the national economy which the claimant can perform consistent

4  with the medically determinable impairments and symptoms, functional limitations, age, education,

5  work experience and skills.  20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).  Here, ALJ

6  Schum determined that there were jobs that existed in significant numbers that Plaintiff could

7  perform, including an assembler, and a packager.  (AR 19-20.)

8        Based on these findings, ALJ Schum determined that Plaintiff was not disabled as defined by

9  the Social Security Act.  (AR 20.)

10  **III.  LEGAL STANDARD**

11        This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

12  U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial

13  evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d

14  1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence" means more than a scintilla,

15  but less than a preponderance, or evidence which a reasonable person might accept as adequate to

16  support a conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The court must

17  consider the administrative record as a whole, weighing both the evidence that supports and detracts

18  from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However,

19  where the evidence is susceptible to more than one rational interpretation, the court must uphold the

20  ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of

21  credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved

22  by the ALJ.  *Id*.  Additionally, the harmless error rule applies where substantial evidence otherwise

23  supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990) (citation

24  omitted).

25  **IV.  ISSUES**

26        Plaintiff seeks reversal of ALJ Schum's denial of disability insurance benefits, arguing that:

27  (1)    The ALJ improperly discounted Plaintiff's credibility**;**

28  Page 13 of  35

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   (2)     The ALJ failed to credit the opinions of Plaintiff's treating doctors;

2   (3)     The ALJ failed to consider lay witness testimony;

3   (4)     The ALJ improperly found that Plaintiff's conditions did not meet or equal an impairment in

4            the Listing of Impairments; and

5   (5)     The ALJ failed to consider all of Plaintiff's impairments.

6                                    **V. DISCUSSION**

7   **A.      Whether the ALJ Improperly Discounted Plaintiff's Credibility**

8            First, Plaintiff argues that the credibility finding against her was improper.  Specifically,

9   Plaintiff contends that the ALJ rejected her subjective symptom testimony merely because there was

10  no showing that her impairments could reasonably produce the degree of symptom alleged.  Plaintiff

11  also argues that the ALJ improperly viewed Plaintiff's own report of her functional level in isolation

12  rather than viewing the report as a whole.  In response, Defendant argues that the ALJ properly

13  found Plaintiff not credible because her statements were inconsistent, conflicted with the opinions of

14  Dr. Pon and Dr. Mathur, and conflicted with Plaintiff's admitted daily activities.

15           A two-step analysis is used when determining whether a claimant's testimony regarding their

16  subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir.

17  2007).  First, it must be determined "whether the claimant has presented objective medical evidence

18  of an underlying impairment 'which could reasonably be expected to produce the pain or other

19  symptoms alleged.'"  *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en

20  banc)).  A claimant does not need to "'show that her impairment could reasonably be expected to

21  cause the severity of the symptom she has alleged; she need only show that it could reasonably have

22  caused some degree of the symptom.'"  *Id*. (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.

23  1996)).  Second, if the claimant has met the first step and there is no evidence of malingering, "'the

24  ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific,

25  clear and convincing reasons for doing so.'"  *Id*. (quoting *Smolen*, 80 F.3d at 1281).  "The ALJ must

26  state specifically which testimony is not credible and what facts in the record lead to that

27  conclusion."  *Smolen*, 80 F.3d at 1284.  Where the ALJ "has made specific findings justifying a

28                                  Page 14 of  35

United States District Court
For the Northern District of California

1    decision to disbelieve an allegation of excess pain, and those findings are supported by substantial

2    evidence in the record," courts must not engage in second-guessing.  *Fair v. Bowen*, 885 F.2d 597,

3    604 (9th Cir. 1989).

4           Here, at the first step, the ALJ found that Plaintiff's medically determinable impairments

5    could reasonably cause the alleged symptoms.  (AR 17.)  However, at the second-step, the ALJ

6    found that Plaintiff's testimony regarding the effects of her symptoms is not credible to the extent

7    that her testimony is inconsistent with the residual functional capacity assessment.  (AR 17.)  The

8    ALJ noted that Plaintiff's testimony 1) was not consistent with the medical findings, and 2) was not

9    consistent with Plaintiff's own assessment of her functional level and abilities.  (AR 17.)  As there

10   are no findings that Plaintiff was malingering, it must be determined whether ALJ Schum's reasons

11   are clear and convincing, and supported by substantial evidence.

12          At the hearing, Plaintiff testified that she was able to stand for 5 to 10 minutes before

13   experiencing throbbing knee and back pain.  (AR 17, 42.)  Further, Plaintiff stated she could not

14   walk too much due to swelling in her knees, and that although she is able to sit, her knees and back

15   are stiff when she gets up.  (AR 17, 42.)  However, the ALJ considered the medical evidence and

16   concluded it did not support Plaintiff's testimony.  (AR 17.)  The ALJ relied on a report of Dr. Pon,

17   an examining physician, that stated Plaintiff was able to sit comfortably, rise from a chair and walk

18   without apparent difficulty, squat halfway down, get on and off the examination table, and had a

19   stable gait.  (AR 17, 266-68.)

20          Plaintiff contends that the ALJ erred by considering these medical findings because an ALJ

21   may not reject subjective symptom testimony merely because there is no showing that the

22   impairment could possibly produce the degree of the symptom alleged.  However, "[w]hile

23   subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by

24   objective medical evidence, the medical evidence is still a relevant factor in determining the severity

25   of the claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir.

26   2001) (citing 20 C.F.R. § 404.1529(c)(2)).  Here, the ALJ was not merely stating that Plaintiff's

27   impairments could not possibly produce the degree of symptom; rather, the ALJ found that Dr. Pon's

28                                         Page 15 of  35

report of Plaintiff's limitations was inconsistent with Plaintiff's testimony as to her limitations. *Thomas*, 278 F.3d at 58-59 (An ALJ may consider the opinion of a physician regarding the nature, severity, and effect of the symptom of which the claimant complains when making a credibility finding).

Plaintiff also argues that the ALJ erred by only citing the report of Dr. Pon, which was made without access to Plaintiff's medical record, and therefore claims that the ALJ's credibility finding is not supported by substantial evidence. However, the ALJ may rely on the report of Dr. Pon, which was based on his independent clinical findings. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (an opinion of an examining physician that is based on independent clinical findings is substantial evidence.)

Dr. Pon performed an evaluation of Plaintiff on September 6, 2007, which revealed an "active range of motion and movements" that Plaintiff voluntarily performed without assistance. (AR 266-67.) As to Plaintiff's back, while Dr. Pon's diagnostics impression was chronic diffused back pain with "possible spinal disc disease and/or degenerative changes of spinal facet joints," inspection was normal with an active range of motion. (AR 267-68.) As to Plaintiff's knees, Dr. Pon diagnosed possible chronic bilateral knee pain with possible degenerative changes, but inspection of Plaintiff's lower extremities was normal. (AR 268.) Plaintiff presented with an active range of motion in both knees. (AR 268.) Upon palpation, Plaintiff complained of tenderness along the medial joint; however, Dr. Pon did not find any laxity, crepitation, or joint deformities. (AR 268.) Dr. Pon further observed that Plaintiff's gait was stable, and she was able to ambulate without aid. (AR 267.) Finally, as to Plaintiff's RFC, Dr. Pon opined that Plaintiff had no gross visual impairment and should be able to stand and sit for six hours in an eight-hour work day.[2] (AR 268.) This report serves as substantial evidence to support the ALJ's credibility findings against Plaintiff, because Dr. Pon's opinion as to Plaintiff's limitations is inconsistent with Plaintiff's testimony as to

---

[2]   The record also contains a report from Dr. Mathur, a consulting physician, that states Plaintiff should be able to stand and sit for a total of six hours during an eight-hour work day, and it assesses a functioning level consistent with a medium level of work. (AR 280.)

United States District Court
For the Northern District of California

her limitations. *Perkins v. Astrue*, 535 F. Supp. 2d 986, 993 (C.D. Cal. 2008) ("An ALJ can properly base an adverse credibility determination on inconsistencies between a claimant's complaints and the clinical findings.")

Second, the ALJ found that Plaintiff's testimony was inconsistent with her own assessment of her functional level. (AR 17.)  An ALJ may consider daily living activities in his credibility analysis. *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005).  When "a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." *Id.* (a claimant's ability to care for her own personal needs, cook, clean and shop support an adverse credibility finding for the claimant); *Orn*, 495 F.3d at 639 (a claimant's ability to read, watch television, and color is not sufficient to support an adverse credibility finding for the claimant).  Like the ALJ in *Burch*, ALJ Schum noted that Plaintiff, in a July 12, 2007 report, stated that she did light housework, performed back and knee exercises three times a week, tended to her son and pets, prepared simple meals for herself, shopped for groceries, and attended her son's football games. (AR 17-18, 117-27.)  Furthermore, the ALJ noted that Plaintiff admitted in her functional report that she has the ability to lift 10 pounds and walk for half a mile, which is consistent with a RFC of sedentary.[3]  (AR 18, 122.)

Plaintiff brings to the Court's attention the fact that the ALJ did not mention that Plaintiff also remarked in the July 12, 2007 functional report that she needed help with her housework, and that her husband "does almost everything." (AR 118.)  While it is true that Plaintiff's assessment of her own daily activities could have been interpreted in a light more favorable to her, it was not unreasonable for the ALJ to conclude, based on the report taken as a whole, that Plaintiff is able to

---

[3]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

perform a sedentary level of work with the additional limitations he noted in his opinion.  (AR 16-18.); *Rollins*, 261 F.3d at 857 (upholding a reasonable finding of the ALJ as to the Plaintiff's credibility where the testimony was equivocal as to how regularly the Plaintiff could keep up with her activities and the finding was supported by substantial evidence).

"We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Magallanes*, 881 F.2d at 750.  Accordingly, this Court finds that the ALJ articulated clear and convincing reasons supported by substantial evidence for discounting Plaintiff's credibility.

**B.      Whether the ALJ Properly Discredited Plaintiff's Treating Doctors' Opinions.**

Next, Plaintiff argues that the ALJ failed to give proper weight to the opinions of her treating doctors.  First, Plaintiff contends that the opinion of her treating physician, Dr. Baig, should be credited because it is consistent with and well-supported by objective medical evidence.  Second, Plaintiff claims that by failing to discuss the opinion of Dr. Shahna Rogosin, Plaintiff's treating psychiatrist, the ALJ effectively rejected this opinion without reason.  In response, Defendant argues that the ALJ accorded proper weight to the opinion of Dr. Baig because the opinion was contradicted by the record, was unsupported, and relied too much on Plaintiff's self-reports.  As to the opinion of Dr. Rogosin, Defendant argues that Plaintiff did not begin treatment with Dr. Rogosin until after her insured period expired, and therefore Dr. Rogosin's opinion is not relevant.  The Court shall consider each in turn.

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Here, there is no dispute that Dr. Baig and Dr. Rogosin are Plaintiff's treating doctors.  Generally, an opinion of a treating physician should be favored over that of a non-treating physician. *Id*.  However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan*, 242 F.3d at 1148.  If a treating physician's opinion is uncontradicted, an ALJ must give "clear and convincing" reasons that are supported by

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  substantial evidence to disregard the opinion. *Lester*, 81 F.3d at 830. If the treating physician's

2  opinion is contradicted, an ALJ need only give "'specific and legitimate reasons' supported by

3  substantial evidence in the record" to disregard the opinion. *Id.* (quoting *Murray v. Heckler*, 722

4  F.2d 499, 502 (9th Cir. 1983)). Furthermore, the ALJ is responsible for determining credibility,

5  resolving conflicts, and resolving ambiguities in the medical evidence. *Magallanes*, 881 F.2d at

6  750.

7        Finally, in determining what weight to give a treating physician's opinion, if a treating

8  physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

9  techniques and is not inconsistent with the other substantial evidence," it should be given controlling

10  weight. 20 C.F.R. § 404.1527(d)(2). When a treating physician's opinion is not entitled to

11  controlling weight, the following factors should be used to determine what weight to give that

12  opinion: length of the treatment relationship and the frequency of examination, nature and extent of

13  the treatment relationship, supportability, consistency, specialization, and any factors that may have

14  bearing. 20 C.F.R. § 404.1527(d)(2)-(6); *see also Orn*, 495 F.3d at 632.

15        1.    Whether the ALJ Properly Discredited the Opinion of Dr. Baig.

16        Plaintiff argues that Dr. Baig's opinion should have been giving controlling weight because it

17  is well-supported by the medical evidence. In response, Defendant asserts that the ALJ properly

18  discredited Dr. Baig's opinion because it is contradicted by the record, unsupported, and relies too

19  much on Plaintiff's self-reports.

20        In his decision, the ALJ assessed Plaintiff's RFC at the sedentary level with the ability to

21  stand/walk for two hours and the ability to sit for six hours during an eight-hour day. (AR 16.) In

22  reaching this finding, the ALJ considered the opinions of Dr. Pon, an examining physician, and Dr.

23  Mathur, a medical consultant. (AR 16.) Both Dr. Pon and Dr. Mathur opined a less restrictive RFC

24  for Plaintiff than that adopted by the ALJ. (AR 16.) The ALJ also noted that the adopted RFC was

25  consistent with Plaintiff's own assessment of her abilities, a third-party function report completed by

26  Plaintiff's husband, and reports from Plaintiff's 2008 knee surgery and follow-up. (AR 18.) Finally,

27  the ALJ considered the opinion of Plaintiff's treating physician, Dr. Baig, that Plaintiff is disabled,

28

1   but afforded this opinion only minimal weight. (AR 18.)  Because Dr. Baig's opinion is

2   contradicted, the ALJ need only give specific, legitimate reasons supported by substantial evidence

3   for giving Dr. Baig's opinion little weight. *Lester*, 81 F.3d at 830.

4          The record indicates that Dr. Baig began treating Plaintiff on January 18, 2007. (AR 362.)

5   The progress notes indicate that Dr. Baig saw Plaintiff for various aliments, but his notes primarily

6   pertain to back pain and knee pain. (AR 327-62.)  On July 16, 2009, Dr. Baig completed two

7   medical statement forms, one for lower back pain and one for knee pain. (AR 325-26.)  On these

8   forms, Dr. Baig check-marked all symptoms that were present on examination and marked that

9   Plaintiff could stand at one time for 15 minutes, sit for 2 hours at one time, and could work 1 hour

10  per day. (AR 325-26.)  Dr. Baig also marked that Plaintiff could never lift, bend, stoop or climb a

11  ladder, but could occasionally balance and climb stairs. (AR 325-26.)  The ALJ accorded these

12  forms little weight because "Dr. Baig failed to provide specific medical findings to support the

13  extreme restrictions alleged." (AR 18.)

14         The SSA sent a letter to Dr. Baig, apparently requesting further explanation of his

15  assessment of Plaintiff's functional level.[4]  (AR 18.)  In a response letter dated August 31, 2009, Dr.

16  Baig stated that Plaintiff suffers from significant pain caused by sciatica, suffers from a painful right

17  knee, which had required recent arthroscopic surgery, and that Plaintiff takes significant medication

18  to manage pain. (AR 401.)  Due to these conditions, Dr. Baig's opinion was that it is "very difficult"

19  for Plaintiff to be normally active or to perform regularly so as to be employed, and that she remains

20  disabled. (AR 401.)  The ALJ found that Dr. Baig's response failed to "provide objective medical

21  findings to support [his] conclusion." (AR 18.)  Further, the ALJ had the impression that, due to a

22  lack of medical findings, Dr. Baig "simply recapitulated the claimant's allegations." (AR 18.)

23         Thus, the ALJ gave two explicit reasons for according little weight to the opinion of Dr.

24  Baig: 1) Dr. Baig failed to provide specific or objective medical findings in support of his opinion,

25  and 2) the opinion appeared to rely primarily on Plaintiff's own self-reports of her symptoms. (AR

26

27         [4] The letter sent to Dr. Baig from the SSA is not contained in the administrative record.

28                                        Page 20 of  35

United States District Court
For the Northern District of California

18.)

As to the first reason, this Court finds that the ALJ properly afforded little weight to the opinion of Dr. Baig because it was not supported by specific medical findings or objective evidence. "When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." *Tonapetyan*, 242 F.3d at 1149 (holding that the ALJ properly rejected the opinion of the claimant's treating physician that claimant could not perform sedentary work because the opinion "was unsupported by rationale or treatment notes and offered no objective medical findings"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ properly discounted treating physician's opinion which was in the form of a check list, and lacked substantive medical findings to support her conclusion). Here, the two medical statement forms were merely check-marked answers, and Dr. Baig did not cite to any medical evidence to support his opinion therein. (AR 325-26.) Even after the SSA requested an explanation for the restrictive RFC findings, Dr. Baig failed to give an explanation or cite to objective medical evidence in support of his opinion. (AR 401.) Instead, his response diagnoses Plaintiff with sciatica and knee pain, without support, and concludes Plaintiff "remains disabled." (AR 401.)

Plaintiff contends that Dr. Baig's RFC opinion was entitled to controlling weight because it was well-supported by the medical evidence. Furthermore, Plaintiff claims that Dr. Baig was not required to submit medical evidence along with his opinion. However, besides merely stating that Dr. Baig's opinion is "strongly supported by the test results and other medical evidence in the record," Plaintiff does not point to any medical evidence that supports or explains Dr. Baig's restrictive RFC opinion. (Pl's Mot. at 5.) The Court's review of the record shows that Dr. Baig's treatment notes, to the extent that they are legible, are equivocal as to the effects of Plaintiff's impairments on her functional level. *See Connett v. Barnhart*, 340 F.3d 871, 874-75 (9th Cir. 2003) (holding that the ALJ properly rejected a treating physician's opinion when the treatment notes provided no basis for the functional restrictions he opined). For example, a treatment note dated February 15, 2007 states that Plaintiff has had lower and upper back pain for the past six years, but

1   there is no notation as to how this pain restricted Plaintiff's functional level.  (AR 360.)  In a March

2   15, 2007 treatment note, Plaintiff reported that her pain was getting better, and a July 27, 2007

3   treatment note states that Plaintiff had lower back pain on and off.  (AR 359, 356).  Again, these

4   notations are not clear as to how Plaintiff's symptoms limited her functional level.

5           The record from Dr. Baig also contains imaging reports, but again these reports are open to

6   more than one interpretation as to the extent of Plaintiff's symptoms.  (AR 328-29, 337-38, 343-44,

7   358.)  For instance, a March 15, 2007 image report of Plaintiff's lower back reports mild anterior

8   endplate lipping at L3-4 through L5-S1, and anterior endplate lipping and slight narrowing at L1-2.

9   (AR 358.)  However, an x-ray alone showing an impairment is not enough to establish disability.

10  *Matthews v. Shalala,* 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is

11  insufficient proof of a disability.")  The ALJ recognized Plaintiff's impairments, but found that she is

12  able to function at a sedentary level with the further limitations noted.  (AR 16.)

13          The ALJ also considered  the reports of Plaintiff's orthopedic surgeon, but found this

14  evidence to support the adopted RFC.  (AR 18, 387-400.)  For instance, on the initial evaluation

15  report dated May 2, 2008, it is noted that Plaintiff has had a long history of intermittent pain,

16  stiffness and popping of the right knee, and that the pain had recently increased.  (AR 399.)  On a

17  March 27, 2009 follow up note, the surgeon recommended that Plaintiff continue with gentle

18  exercise and stay away from high impact activities.  (AR 388.)  Finally, the ALJ found the functional

19  report completed by Plaintiff, as discussed above, supported his RFC finds.  (AR 18.)  The ALJ also

20  considered a functional report completed by Plaintiff's husband, which states Plaintiff did light

21  housework, grocery shops, could lift 15 pounds, and could walk for a quarter of a mile.  (AR 18,

22  130-33.)

23          It is solely the function of the ALJ to resolve ambiguities in the evidence.  *Magallenes*, 881

24  F.2d at 750.  Furthermore, the ALJ fulfilled his duty to further investigate the opinion of Dr. Baig,

25  which he felt lacked specific medical findings.  *Smolen*, 80 F.3d at 1288 (noting that when an ALJ

26  feels he needs to know the basis of a physician's opinion, there is a duty to make an inquiry).

27  Although Dr. Baig responded, his letter still did not provide adequate reference to medical evidence

28                                              Page 22 of  35

**United States District Court**
For the Northern District of California

or provide any rationale for the opinion.  (AR 401); *See* 20 C.F.R. § 404.1527(d)(3) (When a treating physician's opinion is not entitled to controlling weight, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion").  Thus, the ALJ properly declined to afford the opinion significant weight.

Second, the ALJ believed Dr. Baig's opinion was based on Plaintiff's own self-reports.  (AR 18.)  An ALJ may properly discredit the opinion of treating physician when it is based on the subjective characterization made by the plaintiff who is found not to be credible.  *Fair*, 885 F.2d at 605.  Here, as discussed above, the ALJ properly discounted Plaintiff's complaints as to her limitations.  Thus, this serves as another specific and legitimate reason for according Dr. Baig's opinion little weight.

Accordingly, this Court finds that the ALJ properly discredited the opinion of Dr. Baig.

2.    Whether the ALJ Improperly Rejected the Opinion of Dr. Rogosin.

Plaintiff also contends the ALJ rejected the opinion of her treating psychiatrist, Dr. Rogosin, because this opinion was not discussed by the ALJ.  In response, Defendant claims that Dr. Rogosin's opinion is not relevant because her treatment of Plaintiff did not begin until after Plaintiff's insured period expired.

By failing to discuss a physician's opinion and making a contrary finding, an ALJ effectively rejects that opinion without reason.  *Smolen,* 80 F.3d at 1286.  Here, the record indicates that the ALJ did mention the records of Dr. Rogosin and in fact cited to them in support of  his determination that Plaintiff's depression was non-severe.  (AR 15.)  Specifically, the ALJ noted a treatment record from 2008 where Dr. Rogosin found Plaintiff to exhibit good impulse control and described Plaintiff as pleasant.[5]  (AR 15, 312.)  Thus, although the ALJ did not mention Dr. Rogosin by name, he did

_____

[5] The ALJ incorrectly states that  Dr. Rogosin's August 2008 treatment note says that Plaintiff exhibits "good" impulse control, but the records shows that the August 2008 treatment notes states that Plaintiff exhibits "fair" impulse control. (AR 312.) A July 21, 2008 chart note by Dr. Rogosin describes

1    consider her opinion.

2           Plaintiff faults the ALJ for not making mention of Dr. Rogosin's treatments, diagnosis or the

3    determination of a Global Assessment Function of 50 for Plaintiff.  However, an ALJ need not

4    mention every piece of evidence.  *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)

5    (holding that an ALJ does not have to discuss every piece of evidence, but must only give an

6    explanation of a decision to reject significant probative evidence).

7           Further, Plaintiff did not begin to see Dr. Rogosin until April 30, 2008, roughly ten months

8    after June 30, 2007, the date Plaintiff was last insured.  (AR 11, 312-19.)  Under Title II of the

9    Social Security Act, Plaintiff must show that she was disabled during the insured period.  *See* 42

10   U.S.C. 423 (c); *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Thus, Plaintiff has the burden to

11   produce evidence that she was disabled while insured.  *Id.*  Here, Dr. Rogosin's records were made

12   after Plaintiff's insured period expired.  (AR 312-19.)  Reports and observations made after the

13   period of disability are relevant to the  assessment of disability.  *Smith v. Bowen*, 849 F.2d 1222,

14   1225 (9th Cir. 1988).  However, such evidence is relevant to the extent it bears upon the severity of

15   Plaintiff's condition during the time Plaintiff is insured.  *Richmond v. Astrue*, No. EDCV 08-1193

16   JC, 2010 WL 3489171, at *6 (C.D. Cal. Sep. 3, 2010) (citing *Basinger v. Heckler*, 725 F.2d 116,

17   1169 (8th Cir. 1984) (holding that the plaintiff's condition after the insured period expired is relevant

18   if it relates to the condition during the insured period)).  It is not clear from the record, and Plaintiff

19   has not argued, how Dr. Rogosin's post-insured treatments, diagnosis, or the GAF of 50 have bearing

20   on Plaintiff's status during the insured period.  Thus, these records cannot be said to have significant

21   probative value, and therefore the ALJ did not err.  Accordingly, the Court finds that ALJ Schum did

22   not improperly reject the opinion of Dr. Rogosin.

23          Based on the reasoning above, the Court finds that the ALJ properly discredited the opinion

24   of Dr. Pon and did not reject Dr. Rogosin's opinion, but properly considered it in finding that

25   Plaintiff's mental impairment was non-severe.

26   _____

27   Plaintiff as having good impulse control.  (AR 313.)

28
                                        Page 24 of  35

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**C.      Whether The ALJ Erred in Failing to Consider Lay Evidence**

Plaintiff next contends that the ALJ failed to consider lay testimony in the form of two letters submitted by third parties.  In response, Defendant argues that the ALJ was not required to discuss this lay testimony because the letters do not constitute competent evidence.  The record contains two undated letters, one from Plaintiff's friend of 25 years, April Hartness, and the other from her son, Anthony Cleveland.  (AR 164-65.)  The ALJ failed to discuss both of these letters in his opinion. The first undated letter written by Plaintiff's friend states:

> To Whom It May Concern:
>
> Re: Becky Cleveland
>
> I have known Becky for more than 25 years.  We have done many things together. We used to go to football/baseball games, bike riding, walking at the park, family BBQ's at least twice a month hosted by Beck[y].
>
> We really haven't done any of that for about 5 years now.  We do have BBQ's but they are few and far between.  Should you have any questions, please feel free to contact me at (XXX) XXX-XXXX.
>
> Sincerely, April Hartness

(AR 164.)

The second undated letter from Plaintiff's son states:

> Before my mom got injured she used to come home at midnight from work and watch movies with me.  Now after trying to clean a little or run some errands she's in pain and just wants to lie down.  Also before the injury we used to go in the backyard and play football or Frisbee but now she can barely bend over to pick it up.  The injuries are affecting little everyday choices that have changed her life for possibly ever.  Everybody experiences pain differently but living with my mom I can say that the pain she lives with is drastic.  My Mom has tried to do things in her life, like for example she signed up for a Spanish class through Ohlone College but she couldn't keep walking the distance from the car to the class without her knee giving out.  Also every time we go to the grocery store my mom has to lean on the cart to support her injuries.  Now who ever may read this letter please help her out and give her a break.  Thank you!!
> Anthony Cleveland

(AR 165.)

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006); 20 C.F.R. § 404.1513(d)(4).  Such testimony may not be disregarded without

Page 25 of  35

1    comment, and if an ALJ would like to do so, "'he must give reasons that are germane to each

2    witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (quoting *Dodrill v. Shalala*, 12

3    F.3d 915, 919 (9th Cir. 1993)).  "[W]here the ALJ's error lies in a failure to properly discuss

4    competent lay testimony favorable to the claimant, a reviewing court cannot consider the error

5    harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the

6    testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1056.

7    Competent lay testimony may come in the form of "[d]escriptions by friends and family members in

8    a position to observe a claimant's symptoms and daily activities." *Sprague v. Bowen*, 812 F.2d 1226,

9    1232 (9th Cir. 1987); *Nguyen*, 100 F.3d at 1467 (explaining that lay persons are not competent to

10   make medical diagnoses, but can competently testify as to a claimant's symptoms or how an

11   impairment affects a claimant's ability to work).

12        Here, as to the brief letter penned by Ms. Hartness, it does not address Plaintiff's symptoms

13   or ability to work.  Ms. Hartness stated that within the past five years, she and Plaintiff have not

14   engage in social activities as often as they once did.  (AR 164.)  Not only does this letter not address

15   any of Plaintiff symptoms, it does not attribute Plaintiff symptoms to the decline of Plaintiff's

16   participation in social activities.  (AR 164.)  Additionally, this letter does not articulate how

17   Plaintiff's impairments affected her daily activities.  (AR 164.)  Thus, the Court finds that, even if

18   this letter could be said to constitute competent lay witness testimony, had the ALJ had fully

19   credited it, his disability determination would not have been different.  *Stout*, 454 F.3d at 1055-56

20   (an ALJ's failure to discuss lay testimony is harmless error when it is inconsequential to the

21   disability determination).  As for Anthony Cleveland's letter, it addresses Plaintiff's pain symptoms

22   and how Plaintiff's injuries affect her daily activities.  (AR 165.)  For instance, the letter states that

23   Plaintiff is in "drastic" pain, and that every time Plaintiff grocery shops she uses the grocery cart "to

24   support her injuries."  (AR 165.)  Thus, the ALJ was required to give reason for rejecting this

25   testimony.  Nevertheless, an ALJ's failure to address cumulative lay testimony regarding limitations

26   that are accounted for in his decision is harmless error.  *Moore v. Astrue*, No. EDCV 10–1213 JC,

27   2011 WL 1792851, at *7 (C.D. Cal. May 11, 2011) (ALJ's failure to address lay testimony regarding

28

United States District Court
For the Northern District of California

limitations already accounted for in his decision is harmless error when the plaintiff failed to demonstrate how this would have changed the RFC); *Ali v. Comm'r of Soc. Sec.*, No. 07-03628 JSW, 2009 WL 3809796, at *4-5 (N.D. Cal. Nov. 13, 2009) (error for the ALJ to disregard without reason a letter describing the claimant's daily activities and symptoms when the ALJ only had objective medical evidence to consider and the letter would have corroborated the claimant's testimony at the hearing).

Here, the record also contains lay person testimony in the form of a third-party function report filled out by Mr. Cleveland, Plaintiff's husband, on July 14, 2007. (AR 128-35.) The ALJ addressed this report in his opinion. (AR 18.) As the ALJ noted, Mr. Cleveland reported that Plaintiff did light housework all day and was able to walk a quarter of a mile before needing rest, could lift 15 pounds, and drive a car. (AR 18, 131, 133.) Further in this report, Mr. Cleveland noted that Plaintiff experience pain when squatting, bending, standing, walking, sitting, kneeling, climbing stairs, and using her hands. (AR 133.) Finally, Mr. Cleveland reported that prior to becoming injured, Plaintiff was very active, but her injuries prevent her from being as active as she once had been. (AR 132.)

Mr. Cleveland's functional report is similar to the letter of Anthony Cleveland as it accounts for Plaintiff's pain, limited ability to walk, and that her injuries prevent her from engaging in activities she did before she was injured. (AR 128-35.) Anthony Cleveland's letter states that Plaintiff was in pain. (AR 165.) Similarly, Mr. Cleveland reported that Plaintiff experienced pain when squatting, bending, standing, walking, sitting, kneeling, climbing stairs, and using her hands. (AR 133.) Anthony Cleveland's letter says that Plaintiff could not walk the distance from her car to her class at Ohlone College and leaned on a shopping cart while grocery shopping to support her injuries. (AR 165.) Mr. Cleveland similarly reported that Plaintiff could walk for a quarter of a mile before need to rest. (AR 133.) Anthony Cleveland's letter states that Plaintiff is no longer able to play football or Frisbee because she is barely able to bend over. (AR 165.) This too is similar to Mr. Cleveland's report that Plaintiff experienced pain when bending over, and that her injuries prevent her from doing the same activities she had before her injuries. (AR 132-33.)

United States District Court
For the Northern District of California

1    The ALJ accounted for Mr. Cleveland's report in his opinion finding that the information

2    provided by Mr. Cleveland supported the adopted RFC.  (AR 18.)  The ALJ opined that Plaintiff

3    could walk for two hours out of an eight hour day.  (AR 16.)  The ALJ also opined that Plaintiff

4    could climb stairs or a ramp, stoop, crawl, crouch, and kneel only occasionally.  (AR 16.)  The ALJ

5    found that Plaintiff is not able climb a rope, scaffold, or ladder, and unable to use foot controls

6    repetitively.  (AR 16.)  The RFC findings reflect the limitations of Plaintiff's abilities reported by

7    Mr. Cleveland, which are similar to those reported by Anthony Cleveland.  *Moore v. Astrue*, No.

8    EDCV 10–1213 JC, 2011 WL 1792851, at *7 (C.D. Cal. May 11, 2011) (ALJ's failure to address lay

9    testimony regarding limitations already accounted for in his decision is harmless error when the

10   plaintiff failed to demonstrate how this would have changed the RFC)

11       Furthermore, even if the ALJ fully credited this testimony, the Court cannot say that the

12   disability determination would have been any different.  *Stout*, 454 F.3d at 1056.  For instance,

13   Anthony Cleveland's letter states that Plaintiff could not walk the distance from her car to Ohlone

14   College, but it is not clear what the distance was.  (AR 165.)  As for Plaintiff using a shopping cart

15   for support while grocery shopping, again it is not clear how long Plaintiff had walked before

16   needing support.  (AR 165.)  Therefore, the ALJ's failure to discuss the lay testimony of Anthony

17   Cleveland is harmless error.  *Id.*

18       Accordingly, this Court finds that the ALJ's failure to address the lay testimony of Ms.

19   Hartness and Anthony Cleveland does not require reversal.

20   **D.    Whether the ALJ Properly Found that Plaintiff's Conditions did not Meet or Equal an
         Impairment in the Listing of Impairments.**

21

22       Plaintiff next argues that the ALJ improperly found that her impairments or combination of

23   impairments failed to meet or equal listing 1.02, major dysfunction of the joints, or 1.04, disorders of

24   the spine, in the Listing of Impairments.  In response, Defendant argues that the ALJ's decision

25   under step three is supported by substantial evidence.

26       At step three in the sequential process, an ALJ must consider whether a claimant's conditions

27   meet or equal any of the impairments outlined in 20 C. F. R. Part 404, Subpart P, Appendix 1, the

28

United States District Court
For the Northern District of California

1  Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The Listing of Impairments describes

2  impairments that "would prevent an adult, regardless of his age, education, or work experience, from

3  performing *any* gainful activity."  *Sullivan v. Zebley*, 493 U.S. 521, 532  (1990).  If a claimant's

4  "impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to

5  be disabled."  *Yuckert*, 482 U.S. at 141; 20 C.F.R. § 404.1520(e).  The claimant has the burden of

6  proving that her impairments or combination of impairments meet or equal a listed impairment.  20

7  C.F.R. § 404.1520(a)(4)(iii).

8      An impairment meets a listing when all of the medical criteria required of that listing is

9  satisfied.  20 C.F.R. § 404.1525(c)(3); *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To

10  *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a

11  listed impairment relevant to his or her claim.")  "To *equal* a listed impairment, a claimant must

12  establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the

13  characteristics of a relevant listed impairment . . . ."  *Id*. at 1099 (quoting 20 C.F.R. § 404.1526.)

14  Medical equivalence should be based on medical findings and a "generalized assertion of functional

15  problems is not enough to establish disability at step three." *Id.* at 1100.

16      Here, the ALJ found that Plaintiff did not meet or equal Listing 1.02, major dysfunction of a

17  joint, because she did not lose the ability to effectively ambulate.  (AR 16.)  Among the

18  requirements of Listing 1.02, subsection 1.02(A) requires that a claimant's joint impairment results

19  in the "inability to ambulate effectively."  20 C.F.R. Pt. 404, Subpt. P, App. 1., § 1.02(A).  As

20  defined in the Listing of Impairments, a claimant can effectively ambulate if she is "capable of

21  sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of

22  daily living."[6]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.  This means that a claimant "must

23  have the ability to travel without companion assistance to and from a place of employment or

24  _____

25      [6] This definition also provides examples of ineffective ambulation: "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

26

27

28                          Page 29 of  35

United States District Court
For the Northern District of California

1   school."  *Id.*  However, a claimant's "ability to walk independently about one's home without the use

2   of assistive devices does not, in and of itself, constitute effective ambulation."  *Id.*

3       Plaintiff argues that the ALJ's conclusion that Plaintiff can effectively ambulate is directly

4   contradicted by the opinion of Dr. Baig, who opined on two medical statement forms that Plaintiff

5   could not ambulate effectively.  However, as discussed above, the ALJ properly accorded only

6   minimal weight to Dr. Baig's opinion.  Additionally, the ALJ's finding is supported by substantial

7   evidence.  For instance, the report of Dr. Pon states that Plaintiff  was able to ambulate without aid

8   and had a stable gait.  (AR 267); .  *Orn*, 495 F.3d at 632 (an opinion of a consultative examiner

9   constitutes substantial evidence because it is based on the examiner's own independent finding).

10  Furthermore, Plaintiff admitted in her function report that she could walk for half a mile before

11  needing to rest, and did activities such as shopping.  (AR 120, 122.)

12      Plaintiff also seems to suggest that the ALJ erred in finding she did not meet Listing 1.04,

13  disorders of the spine, because of Dr. Baig's opinion that she could not ambulate.  Under Listing

14  1.04, a claimant will be found disabled if he or she has a spine disorder and meets the requirements

15  of either subsection A, B, or C.[7]  Subsection C is relevant to Plaintiff's argument as it requires a

16  showing of  "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on

17  appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness,

18  and resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C).  In

19  her motion, Plaintiff argues that the ALJ erred in his determination that she could not ambulate

20  effectively.  However, as discussed above, the ALJ's determination that Plaintiff retained the ability

21  to ambulate effectively was not improper. (AR 16.)  Furthermore, the ALJ found that Plaintiff

22  presented no evidence of lumbar spinal stenosis resulting in pseudocladication or any other

23  requirements of subsection (C).  (AR 16.)  Thus, Plaintiff has not met her burden of establishing that

24  she meets or equals all the requirements of subsection (C) of Listing 1.04.  *Tackett,* 180 F.3d at

25

26      [7] Plaintiff does not argue in her brief that her back impairment meets the requirements of either
    subsection A or B under Listing 1.04.  Accordingly, the court only addresses subjection C which
27  requires a showing that a claimant cannot ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
    1.04(C).

28

1    1099.  Accordingly, the ALJ properly concluded Plaintiff's back impairment did not meet or equal

2    Listing 1.04.

3         Plaintiff next argues that the ALJ failed to consider all of Plaintiff's impairments in

4    combination under step three.  Plaintiff claims that had all of her impairments been considered in

5    combination, the severity would have equaled Listing 1.02 or 1.04.  When a claimant has more than

6    one impairment, an ALJ must decide if the combination of impairments is "medically equal to any

7    listed impairments."  *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (quoting 20 C.F.R.

8    404.1526(a)).  All the symptoms must be considered in combination and cannot be "fragmentize."

9    *Lester,* 81 F.3d at 829 (quoting *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985)).  If a

10   claimant's combination of impairments at least "equal[s] medical significance to those of a listed

11   impairment," medical equivalence should be found.  20 C.F.R. § 404.1526(b)(3).  An ALJ should

12   consider only medical evidence when finding an equivalence.  *Lewis*, 236 F.3d at 514.  "A

13   boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do

14   so." *Id*. at 512.

15        Here, the ALJ found that Plaintiff's impairments in combination do not equal any listing, but

16   he did not discuss the combined effects of Plaintiff's impairments or compare them to a listing under

17   step three.  (AR 16.)  However, a claimant must put forth some theory as to how the combined

18   effects of their impairments equal a listed impairment.  *See Burch*, 400 F.3d at 683 (explaining that

19   when the claimant does not present evidence of how his impairments in combination equal a listing,

20   the ALJ is not required to discuss the combined effects) (citing *Lewis*, 236 F.3d at 514 (ALJ's failure

21   to discuss the combined effects of the claimant's impairments is not reversible error when the

22   claimant offered no theory as to how his combination of impairments equaled a listed impairment)).

23   Here, Plaintiff simply states that her impairments in combination should have the equivalence of

24   Listing 1.02 or 1.04.  Plaintiff does not offer any theories of how her impairments in combination

25   would equal either listing, nor does she point to the medical evidence that would support a finding of

26   equivalence.  *See Linsky v. Astrue*, No. C 07-03482 SI, 2008 US Dist. Lexis 90163, at *14-15 (N.D.

27   Cal. May 20, 2008) (finding that a court cannot be expected to fill in the gaps as to how Plaintiff

28

**United States District Court**
For the Northern District of California

1   meets or equals a listing when Plaintiff simply lists her impairments and refers to a physician's

2   opinion in her motion).  Therefore, the ALJ did not commit reversible error by failing to discuss the

3   combined effects of Plaintiff's impairments. *Lewis*, 236 F.3d at 514 (ALJ's failure to discuss

4   combined effects of the claimant's impairments is not reversible error when the claimant failed to

5   offer a theory of how his impairments combined equaled a listed impairment).

6        Accordingly, the Court finds that the ALJ properly found that Plaintiff's impairments singly

7   or in combination did not meet or equal a listed impairment, and the ALJ's failure to discuss

8   Plaintiff's impairments in combination does not require reversal.

9   **E.    Whether the ALJ Failed to Consider All Plaintiff's Impairments in Combination**.

10       Plaintiff's final argument is that the ALJ failed to consider all of her impairments in

11   combination.  Plaintiff claims that the ALJ: 1) improperly analyzed her mental impairments; 2)

12   failed to include her carpal tunnel syndrome in his analysis; 3) improperly excluded her sleep apnea

13   from his analysis; and 4) made no mention of her abnormal echocardiogram report.  In response,

14   Defendant argues that (1) the ALJ properly reviewed and considered the relevant evidence, and (2)

15   the ALJ's RFC findings are supported by substantial evidence.  The Court shall consider each

16   impairment in turn.

17       At step four of the sequential process, it is up to the ALJ to determine a claimant's RFC.

18   *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545).  "The ALJ is

19   required to consider all of the limitations imposed by the claimant's impairments, even those that are

20   not severe."  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).

21       First, Plaintiff argues that the ALJ improperly analyzed her mental impairments because the

22   ALJ never discussed or mentioned her treatment with Dr. Rogosin, her treating psychiatrist.

23   However, as discussed above, the record reveals that the ALJ considered and mentioned the

24   treatment of Dr. Rogosin in his findings that Plaintiff's mental illness is non-severe.  (AR 15.)  As

25   Plaintiff makes no new argument as to how the ALJ improperly analyzed Plaintiff's mental

26   impairments, the Court rejects this argument for the same reasons stated above.

27

28                                  Page 32 of  35

United States District Court
For the Northern District of California

1    Second, Plaintiff argues that the ALJ did not include her carpal tunnel syndrome in his

2    analysis.  Specifically, Plaintiff argues that the ALJ, in finding this impairment non-severe, mis-

3    characterized the report of Dr. Pon that Plaintiff's wrist were normal, and then made no further

4    mention of this impairment in his decision.  Defendant argues that the ALJ did not mis-characterize

5    Dr. Pon's opinion, and that the ALJ did consider Plaintiff's carpal tunnel syndrome elsewhere in his

6    opinion.

7    In his decision, the ALJ found that Plaintiff had not established her carpal tunnel syndrome

8    as a severe impairment.  (AR 14.)  ALJ Schum noted that Plaintiff complained of hand pain and

9    numbness; however, he also noted that Dr. Pon found Plaintiff's "wrist were normal although she

10   complained of tenderness with palpation" and did not have any functional impairment of her right or

11   left hands.  (AR 14, 267-68.)  As Plaintiff points out, Dr. Pon's diagnostic impression for Plaintiff

12   stated chronic bilateral wrist pain and possible tendonitis.  (AR 268.)  However, as Defendant

13   argues,  this does not render the ALJ's summarization of the report as a mis-characterization because

14   ultimately, Dr. Pon found that Plaintiff had no functional limitations.  (AR 268.)  Thus, based on this

15   report, there were not any functional limitations to be assessed in Plaintiff's RFC resulting from her

16   carpal tunnel syndrome.  *See Burch*, 400 F.3d at 683 (finding that Plaintiff must demonstrate the

17   functional limitations resulting from an impairment that the ALJ failed to consider).

18   When considering Plaintiff's testimony in support of his RFC findings, the ALJ also noted

19   that Plaintiff testified that she experienced numbness and pain in her hands and arms due to carpal

20   tunnel syndrome.  (AR 17.)  However, Plaintiff had not undergone the recommended surgery

21   because "people had told her that the operation would not be successful."  (AR 17.)  Impairments

22   that can be controlled by treatments cannot be the basis for finding a disability.  20 C.F.R. §

23   404.1530 (a); *Warre v. Comm'r of Soc. Sec. Admin.*,  439 F.3d 1001, 1006 (9th Cir. 2006).  Thus, the

24   ALJ appropriately considered Plaintiff's carpal tunnel syndrome in his RFC findings.

25   Third, Plaintiff contends that the ALJ improperly excluded her sleep apnea from his analysis

26   by dismissing it as non-severe and not mentioning it in his RFC assessment.  In response, Defendant

27   argues that the ALJ properly considered Plaintiff's sleep apnea, finding it non-severe for three

28

United States District Court

For the Northern District of California

1    reasons: 1) the diagnosis was moderate; 2) it was treatable; and 3) Plaintiff discontinued her

2    prescribed treatment.

3         In his opinion, the ALJ noted that a November 2002 report showed Plaintiff had moderate

4    sleep apnea.  (AR 14.)  However, the ALJ also noted that a December 2007 report showed only mild

5    obstructive sleep apnea, which was nearly eliminated with the use of a continuous positive airway

6    pressure ("CPAP") machine.  (AR 14.)  Plaintiff testified that although she had a CPAP machine, she

7    had stopped using it for the past eight months.[8]  (AR 14, 38.)  Also, Plaintiff testified at the hearing

8    that, as a result of her of her discontinued use of the CPAP machine, she noticed a slight difference

9    in her quality of sleep, making her tired throughout the day.  (AR 38.)  However, as with Plaintiff's

10   carpal tunnel syndrome, impairments that can be controlled by treatments cannot be the basis for

11   finding a disability.  20 C.F.R. § 404.1530 (a); *Warre*, 439 F.3d at 1006.

12        Finally, Plaintiff argues that the ALJ erred in failing to discuss her abnormal echocardiogram

13   report.  Defendant responds by arguing that Plaintiff did not list this as impairment limiting her

14   ability to work, and Plaintiff does not explain how these abnormalities limit her.  The Court agrees

15   with Defendant.  The record contains an echocardiogram report dated August 17, 2007 with overall

16   normal findings, except for mild left atrial enlargement, a possible atrial septal defect, mild mitral

17   regurgitation, and tricuspid valve regurgitation.  (AR 355.)  However, Plaintiff never claimed these

18   abnormalities as an impairment in her application for disability, and did not raise this before the

19   ALJ.  *Bowser v. Comm'r of Soc. Sec.*, 121 Fed. Appx. 231, 236-37 (9th Cir. 2005) (finding that the

20   ALJ did not err in failing to account for the effects of an impairment when the claimant did not

21   allege the impairment in her disability application or raise the issue before the ALJ, and there was no

22   diagnosis in the record.)  Moreover, besides pointing out that this report is present in the record,

23   Plaintiff fails to cite any evidence that these abnormalities caused her any limitation.  *Burch*, 400

24

25

26        [8] At the hearing, Plaintiff testified that she stopped using the CPAP machine because it was too
     much to care for.  (AR 38.)  However, Plaintiff did not make the argument that she had good reason for
27   discontinuing her prescribed treatment; therefore, the Court will not consider this issue.

28                                            Page 34 of  35

F.3d at 683 (finding that Plaintiff must demonstrate the functional limitations resulting from an impairment that the ALJ failed to consider).

Therefore, the Court finds that the ALJ properly accounted for all limitations imposed by Plaintiff's impairments in his opinion.

## VI.  CONCLUSION

Based on the foregoing analysis, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 8, 2011

_____

MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
For the Northern District of California

Page 35 of  35